# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 11, 2017     Decided February 10, 2017

No. 16-7055

SINA CHENARI,
APPELLANT

v.

GEORGE WASHINGTON UNIVERSITY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-00929)

*Jason J. Bach* argued the cause and filed the briefs for appellant. *Tracy D. Rezvani* entered an appearance.

*Nicholas S. McConnell* argued the cause for appellee. With him on the brief was *James N. Markels*.

Before: TATEL, MILLETT, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: After George Washington University Medical School expelled appellant for cheating on an exam, he brought suit in federal court for breach of

2

contract and discrimination based on disability. The district court granted summary judgment to the University, deferring to its view that appellant broke its honor code and finding no violation of the relevant disability statutes. For the reasons set forth in this opinion, we affirm.

**I.**

On December 14, 2012, appellant Sina Chenari, a third-year medical student at George Washington University, took the Step 1 Surgery Shelf Exam, a standardized test published by the National Board of Medical Examiners (NBME). Before the exam, the proctor read aloud the instructions from NBME's official Chief Proctor's Manual, including that students must complete the exam in two and a half hours and that "[n]o additional time [would] be allowed for transferring answers" from the test booklet to the answer sheet. Chenari also received a copy of the "Exam Guidelines," which contained a similar warning.

In his deposition, Chenari explained that when the proctor called time, he discovered that he had failed to transfer some twenty or thirty answers from the test booklet to the front side of the answer sheet. According to Chenari, he "panicked" and "continued to transfer my answers." Chenari Dep. 267:7–:9. The proctor "asked me to stop," but "I continued to bubble in [the answer sheet]." *Id.* at 269:6–:18. When the proctor then "reached over me to try to get the exam, I just put my hand over the booklet and the exam and just continued to bubble in my answers." *Id.* at 270:3–:6. Once Chenari finished, he "sat back" and the proctor "picked [the exam] up." *Id.* at 278:21–280:11. As Chenari concedes, he ended up taking an additional "90 seconds to two minutes." *Id.* at 271:12–:13.

3

The proctor reported Chenari to the medical school's administration, as did another student present at the exam. In response, Associate Dean for Students Rhonda Goldberg met with Chenari to discuss the incident. According to Goldberg's deposition, Chenari told her that he "needed to" finish bubbling in his answers but "probably made a mistake" by doing so. Goldberg Dep. 23:1–:3.

Pursuant to University procedures, Goldberg formed an Honor Code Council subcommittee to investigate. After holding a hearing, the subcommittee issued a report recommending Chenari's dismissal for academic dishonesty. The subcommittee forwarded its recommendation to the Medical Student Evaluation Committee, and in a written statement to that Committee Chenari took responsibility for his "deplorable behavior" toward the proctor, acknowledging his "clear violation of the most basic rules of th[e] University." Chenari Dep. Ex. 37 at 1. He nonetheless asked for leniency because, he insisted, his "behavior did not involve deception" and he had no prior disciplinary infractions. *Id.* After a hearing, the Committee unanimously recommended Chenari's dismissal. The Medical School Dean then reviewed the reports, met with Chenari, and upheld the recommendation of dismissal. Now represented by counsel, Chenari appealed to the Provost, arguing in a written submission that his conduct lacked "an element of deceit" like "cheat[ing]" or "l[ying]." Chenari Dep. Ex. 40 at 1. Rather, his "mistake" was "completely out in the open." *Id.* at 2. The Provost denied the appeal, and the University dismissed Chenari from the medical school.

On May 30, 2014, Chenari filed this action in the U.S. District Court for the District of Columbia seeking reinstatement and damages. He alleged several theories of relief. First, he argued that he never violated the University's

4

Honor Code, so the University's decision to dismiss him breached its contract with him and the contract's implied covenant of good faith and fair dealing. Second, he claimed that he has a disability, Attention Deficit Hyperactivity Disorder (ADHD), which he alleged the University failed to accommodate in violation of the Rehabilitation Act ("Rehab Act"), 29 U.S.C. § 794(a), and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132. Although Chenari also claimed that he suffered from anxiety, he never argued, either here or in the district court, that his anxiety qualified as a disability under the disability statutes. *See Adams v. Rice*, 531 F.3d 936, 943 (D.C. Cir. 2008) (describing "disability" as a "term of art under the statute[s]"). Finally, Chenari argued that the University discriminated against him for his ADHD and retaliated against him "when he began to advocate for his rights," claims he does not pursue on appeal. Compl. ¶¶ 44, 55. The University moved for summary judgment, which the district court granted. *Chenari v. George Washington University*, 172 F. Supp. 3d 38 (D.D.C. 2016).

**II.**

We review an order granting summary judgment *de novo*, viewing the evidence and drawing all reasonable inferences in favor of the nonmoving party. *Foster v. Sedgwick Claims Management Services, Inc.*, 842 F.3d 721, 725 (D.C. Cir. 2016). Summary judgment is appropriate if the movant, here the University, "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016) (alteration, internal quotation marks, and citation omitted). We begin with Chenari's contract claims.

5

**A.**

Under District of Columbia law, which governs here, "'the relationship between a university and its students is contractual in nature.'" *Manago v. District of Columbia*, 934 A.2d 925, 927 (D.C. 2007) (quoting *Basch v. George Washington University*, 370 A.2d 1364, 1366 (D.C. 1977) (per curiam)). In breach of contract cases against a university, "a judgment by school officials that a student has not performed adequately to meet the school's academic standards is a determination that usually calls for judicial deference." *Alden v. Georgetown University*, 734 A.2d 1103, 1108 (D.C. 1999). This rule stems from the principle that a diploma publicly signals a school's confidence in a student's knowledge and skills, so the "'decisions surrounding the issuance of these credentials [should] be left to the sound judgment of the professional educators who monitor the progress of their students on a regular basis.'" *Id.* at 1109 (quoting *Olsson v. Board of Higher Education*, 402 N.E.2d 1150, 1153 (N.Y. 1980)). A university "will be entitled to summary judgment unless the plaintiff can provide some evidence from which a fact finder could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance." *Id.* (citation and internal quotation marks omitted). Similarly, to show that a university breached the implied covenant of good faith and fair dealing, a plaintiff must allege "either bad faith or conduct that is arbitrary and capricious" and, in resolving such cases, courts must not "substitut[e] their judgment improperly for the academic judgment of the school." *Wright v. Howard University*, 60 A.3d 749, 754–55 (D.C. 2013) (alteration and internal quotation marks omitted) (citing *Allworth v. Howard University*, 890 A.2d 194, 202 (D.C. 2006); *Alden*, 734 A.2d at 1111 n.11). True, all these cases involve decisions about academic performance, not honor code violations, but Chenari does not argue—nor do we

6

decide—that a different standard should apply here. *Cf. Hajjar-Nejad v. George Washington University*, 37 F. Supp. 3d 90, 116–18 (D.D.C. 2014) ("[C]ourts have concluded that, *particularly for medical students*, professional comportment issues fall under the umbrella of deference to academic decisions."). Because the standards for breach of contract and implied covenant cases overlap, we address Chenari's two claims together.

The University dismissed Chenari for violating its Honor Code. Section F(2)(a) of that Code prohibits students from "giv[ing] or receiv[ing]" unpermitted aid on tests and assignments, plagiarizing, falsifying reports, infringing on the rights of other students, or "violat[ing] any other commonly understood principles of academic honesty." Goldberg Decl. Ex. A at 8. The University concluded that Chenari violated the Code's "any other" clause by "knowingly continu[ing] to fill in his answers on his answer sheet after time was called and until he completed his answer sheet despite having been instructed by a university proctor three times to stop doing so." Chenari Dep. Ex. 37 at 4. We agree with the district court that this represents a perfectly "rational basis" for disciplining Chenari. *Alden*, 734 A.2d at 1109. As the district court explained, Chenari "stole time," gaining "an unfair advantage over the peers who adhered to the rules"—an obvious breach of an Honor Code that prohibits violation of "commonly understood principles of academic honesty." *Chenari*, 172 F. Supp. 3d at 49; s*ee Alden,* 734 A.2d at 1111 ("Far from lacking a rational basis for dismissal, the Committee on Students had sufficient *academic* evidence in the record from which to determine that Alden should be dropped from the school's rolls.").

Chenari nonetheless argues, for four separate reasons, that the University's decision lacked a rational basis. First, he

7

points out that the proctor failed to cite the Honor Code or Exam Guidelines in her initial report to the University, but he cites nothing in the University's rules requiring that she do so. Second, he claims that he made no "attempt . . . to conceal his actions." Appellant's Br. 19. This is absurd. Just as stealing is stealing, whether at gunpoint or in secret bank transfers, so cheating is cheating, whether in front of a proctor or behind the proctor's back. Third, and "most importantly" to Chenari, the University scored his completed answer sheet and "determined that [he] did in fact pass the exam." Appellant's Br. 20. This too is absurd—so absurd that it hardly requires a response, other than to point out that Chenari may well have passed the exam *because* he took an additional ninety seconds to fill in his answer sheet.

Chenari's only argument that could conceivably raise doubts about the University's explanation is his assertion that transferring answers from a test booklet to the answer sheet after time expired represented a "common and accepted practice of the GWU medical school." Appellant's Br. 19. But if that is so, why in his deposition did Chenari state that he had seen his classmates do so "covertly," and why, during the disciplinary process, did he characterize his conduct as an act "with blatant disregard for the rules and for the rights of my fellow students"? Chenari Dep. 272:21–:22, Ex. 37 at 1. In any event, whatever the common practice at the medical school, *this* exam was administered under NBME procedures, which expressly warned that "[n]o additional time will be allowed for transferring answers" from the test booklet to the answer sheet. Ruiz Decl. at 2.

Finally, Chenari argues that the University acted in bad faith by dismissing him rather than accommodating his ADHD. As the district court explained, however, Chenari has pointed to no record evidence that "the [University] or any

8

individual involved in the [disciplinary] process acted out of bad faith or ill will." *Chenari*, 172 F. Supp. 3d at 48. Nor does he claim that dismissing him for cheating was either excessive or discriminatory. Chenari simply urges us to infer that the University acted in bad faith because it "did absolutely nothing to help him." Appellant's Br. 20. But even if such an inference would be appropriate, Chenari's argument turns entirely on how the University in fact responded to his claimed disability, an issue to which we now turn.

**B.**

Chenari argues that the University discriminated against him in violation of Title II of the ADA, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). Title II, however, prohibits discrimination only by a "public entity," a term the ADA defines as "any State or local government," an instrumentality of a state or local government, "the National Railroad Passenger Corporation, and any commuter authority." 42 U.S.C. §§ 12131(1), 12132. Because George Washington University, a private institution, fits none of these definitions, Chenari's Title II claim fails. *Cf. Singh v. George Washington University School of Medicine and Health Services*, 508 F.3d 1097, 1105 (D.C. Cir. 2007) (citing 42 U.S.C. § 12182) (deciding a similar case under Title III of the ADA, which prohibits discrimination by a "place of public accommodation"). This pleading error, however, makes little difference because Chenari may pursue his claim under Section 504 of the Rehabilitation Act. *See American Council of the Blind v. Paulson*, 525 F.3d 1256, 1260 n.2 (D.C. Cir. 2008) (explaining that the Rehab Act and Title II of the ADA "are similar in substance and consequently cases interpreting either are applicable and interchangeable" (alterations, citations, and internal quotation marks omitted)); *Harrison v. Rubin*, 174 F.3d 249, 253 (D.C.

9

Cir. 1999) ("Claims and defenses under the two statutes are virtually identical.").

To prevail on his failure-to-accommodate claim, Chenari must "produce sufficient evidence (a) that [he] was disabled for the purposes of the Rehabilitation Act, (b) that [the University] had notice of [his] disability, and (c) that [the University] denied [his] request for a reasonable accommodation of [his] disability." *Stewart v. St. Elizabeths Hospital*, 589 F.3d 1305, 1307–08 (D.C. Cir. 2010) (citations omitted); *see Davis v. Shah*, 821 F.3d 231, 259–60 (2d Cir. 2016) ("A plaintiff may base her [section 504] discrimination claim on . . . failure to make a reasonable accommodation."); *see also American Council*, 525 F.3d at 1260 & n.2, 1266–67 & n.14 (allowing a failure-to-accommodate theory to proceed under the Rehab Act and "constru[ing] section 504 *in pari materia* with Title II of the ADA"); *McElwee v. County of Orange*, 700 F.3d 635, 640 & n.2 (2d Cir. 2012) (treating as "interchangabl[e]" Title II's "reasonable modifications" requirement and Title I's "reasonable accommodations" requirement). The district court granted summary judgment to the University because, in its view, Chenari had offered no evidence showing either that the University had notice of his disability or that he had requested an accommodation. *Chenari*, 172 F. Supp. 3d at 51–56.

On appeal, Chenari insists that he did give the University notice of his ADHD. In support he cites his deposition, in which he claims that, in a meeting with Goldberg and another University official in October 2012—two months before the surgery exam—he informed them of his ADHD diagnosis, including that he had been prescribed medication for the disorder. In her deposition, however, Goldberg denied Chenari's account of the meeting, claiming that they discussed only his academic performance.

10

This is a classic "genuine dispute as to [a] material fact." Fed. R. Civ. P. 56(a). Under oath, Chenari testified that he informed Goldberg of his ADHD. Under oath, Goldberg denied it. At summary judgment, a court "may not . . . believe one witness over another if both witnesses observed the same event in materially different ways." *Johnson*, 823 F.3d at 705. Indeed, a court "may not believe" the movant's witness—here the University's—given its obligation to view the record "in a light most favorable to the nonmoving party"—here, Chenari. *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016).

In dismissing Chenari's testimony as "insufficient to create a genuine dispute of material fact," *Chenari*, 172 F. Supp. 3d at 54, the district court applied the well-accepted rule that courts may "lawfully put aside testimony that is so undermined as to be incredible." *Robinson*, 818 F.3d at 10 (quoting *Johnson v. Washington Metropolitan Area Transit Authority*, 883 F.2d 125, 128 (D.C. Cir. 1989), *abrogated on other grounds by Robinson v. District of Columbia*, 580 A.2d 1255, 1258 (D.C. 1990)). That scenario is "most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence, physical impossibility or other persuasive evidence that the plaintiff has deliberately committed perjury." *Johnson*, 883 F.2d at 128. This is not such a case.

The University cites nothing to indicate that Chenari's testimony is "undermined . . . by other credible evidence, physical impossibility or other persuasive evidence." Moreover, as this court has explained, evidence sufficient to dismiss a plaintiff's uncorroborated, self-serving testimony—the situation here—is "rare[]." *Robinson*, 818 F.3d at 10. For example, summary judgment is proper when a plaintiff's statement is demonstrably false after review of a "quite

11

clear[]" videotape, or when the testimony is contradicted by "multiple disinterested witnesses." *Id.* (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Johnson*, 883 F.2d at 128–29). Here, by contrast, we have only Goldberg's contradictory testimony and, as the district court pointed out, that Chenari never mentioned his ADHD in other meetings with University officials, including during his disciplinary proceedings. *See Chenari*, 172 F. Supp. 3d at 52–54. Those facts certainly go to Chenari's credibility, but nothing about them is "remotely compelling enough to require a jury to disregard" his testimony. *Robinson*, 818 F.3d at 11.

Although the district court thus erred in granting summary judgment on the notice question, this does not end the matter. As explained above, in order to prevail on his failure-to-accommodate claim, Chenari must demonstrate not only that he gave notice, but also that the University denied a requested accommodation. After considering the evidence, the district court found that Chenari failed to seek a reasonable accommodation. *See Chenari*, 172 F. Supp. 3d at 54–56.

Chenari concedes that he never requested an accommodation, but argues that his "repeated notifications to the administration created an obligation on [the University] to investigate and implement reasonable accommodations." Appellant's Br. 28. To be sure, there may well be cases where the plaintiff's need for an accommodation is so apparent that the defendant must offer one regardless of whether the plaintiff requested it. *See, e.g.*, *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 269–70 (D.D.C. 2015) (rejecting "the District's suggestion that a prison facility need not act to accommodate an obviously disabled inmate if the inmate does not ask for accommodations"). Although we doubt that this is such a case, we have no need to consider the question given

12

that the record makes abundantly clear that the University did offer Chenari an accommodation.

As Chenari conceded in his deposition, University officials twice referred him to counseling and therapy, including once to a specific counselor to deal with his anxiety about a course involving roleplaying. Chenari acknowledged that he never followed up on those referrals, insisting that he had "no time," though he never requested time off to seek therapy—as he also concedes. Chenari Dep. 246:8–:9.

In addition to these express offers of assistance, the University has an Office of Disability Support Services, which, according to its director, "receive[s] and evaluate[s] requests for accommodations from students." McMenamin Decl. 1. Goldberg explained in her declaration that she tells all first-year students that "if they have a disability and need to request an accommodation, it is the student's responsibility to go to [the Office] to pursue that matter." Goldberg Decl. 1. Moreover, the University's "First Year Survival Guide" for medical students instructs "[s]tudents who suspect that they may have a disability[] which may require an accommodation" to contact the Office.

Finally, the Office of Disability Support Services maintains a website that walks students through the process for obtaining a reasonable accommodation. *See Disability Support Services*, George Washington University, https://disabilitysupport.gwu.edu/ (last visited Feb. 2, 2017). At the time Chenari attended the University, the website included specific instructions about how students with ADHD could obtain accommodations. Although Chenari testified that he "did not know" about the website, he admitted receiving and "looking through" the First Year Survival Guide, and as noted above, Goldberg reported that she told all entering

13

students about the disability office. Chenari Dep. at 176:19, 186:18–19.

To sum up, then, the University not only twice offered Chenari counseling, but also, through its Disability Office and that office's website, offered all students a procedure for obtaining any reasonable accommodation they might need. The Rehabilitation Act requires nothing more.

## III.

For the foregoing reasons, we affirm.

*So ordered.*